# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

ERINDIRA ESPERANZA
GUZMAN-IBARGUEN, *et. al.*,

Plaintiffs,

vs.

SUNRISE HOSPITAL AND MEDICAL
CENTER, *et. al.*,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:10-cv-1228-PMP-GWF
**Consolidated with:**
Case No. 2:10-cv-1983-PMP-GWF

**ORDER**

**Motion to Compel Answers to
Interrogatories and Requests for
Production - #50**

This matter is before the Court on Plaintiffs' Motion to Compel Answers to Interrogatories and Requests for Production (#50), filed on March 28, 2011; Defendant's Opposition to the Motion to Compel (#58), filed on April 14, 2011; and Plaintiff's Reply to Response to Motion to Compel (#59), filed on April 14, 2011. The Court conducted a hearing in this matter on May 10, 2011.

## BACKGROUND

These consolidated actions arise out of the suicide of Plaintiffs' decedent Oscar Mejia-Estrada on July 27, 2008 at Sunrise Hospital and Medical Center in Las Vegas, Nevada. The Plaintiffs filed their complaint in the United States District Court, Case No. 2:10-cv-1228, against Defendant Sunrise Hospital and Medical Center ("Sunrise") on July 22, 2010. The amended complaint in this action alleges a claim against Sunrise for violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395(d)(2)(A) et seq. Plaintiffs also filed an action in the Nevada District Court against Sunrise, certain nurses and other employees of Sunrise, and Southwest Emergency Associates and Fremont Emergency for medical malpractice

under Nevada law.  The Defendants removed this action to federal court on November 12, 2010.  *See Notice of Removal (#1), Exhibit A,* Case No. 2:10-cv-1983. The two actions were consolidated into Case No. 2:10-cv-1228 on December 6, 2010.  *Order (#27).*  The allegations in both actions are essentially the same.

On July 25, 2008, an ambulance was dispatched to Harrah's [Hotel/Casino] in regard to a report that an individual later identified as Oscar Mejia-Estrada was "displaying suicidal and homicidal ideation."  The ambulance attendants transported Mr. Mejia-Estrada to the Sunrise Emergency Room for evaluation.  The doctor and nurse(s) who examined and evaluated Mr. Mejia-Estrada concluded that he did not have an "acute/emergent medical condition" and was not a suicide or homicide risk.  Mr. Mejia-Estrada was discharged from the Sunrise Emergency Room approximately 1 hour and 2 minutes after his arrival.  *Amended Complaint (#8)*, Case No. 2:10-cv-1228, ¶¶ 15-21.  *See also Plaintiffs' Motion to Compel (#50), Exhibit 2,  Affidavit of Plaintiff's Expert Medical Witness Dr. Paul Bronston ("Bronston Affidavit"),* ¶¶ 5-14.

Mr. Mejia-Estrada returned to the Sunrise Emergency Room on July 27, 2008 at 12:40 A.M. accompanied by family members.  The hospital records stated that the reason for this return visit was: "Depressed anxious here 2 day." *Bronston Affidavit,* ¶ 15.  Mr. Mejia-Estrada was examined and evaluated by a triage nurse and by a Dr. Weng.  Mr. Mejia-Estrada appeared to have altered thought processes, and reported restlessness and anxiety that was moderate in severity.  He denied suicidal ideation or plan.  He also appeared agitated, had hyperactive body language and respiratory distress was present.  The hospital staff concluded that Mr. Mejia-Estrada did not have any physical illness or injury, but based on his chief complaints of depression and anxiety, he was assessed as a suicide risk. *Bronston Affidavit,* ¶ 23.  Dr. Weng executed a form at 2:30 A.M. giving medical clearance for Mr. Mejia-Estrada to have a psychiatric evaluation and also admitting him to the hospital for appropriate medical care.  The Emergency Room nurse initiated "suicide precautions" at or about 5:25 A.M., which apparently required that Mr. Mejia-Estrada be checked at 15 minute intervals.  Mr. Mejia-Estrada was issued a hospital gown and socks and he remained in the hospital

emergency department awaiting a mental health evaluation. *Bronston Affidavit*, ¶¶ 25-26.[1]

At 12:45 P.M. a nurse assistant found Mr. Mejia-Estrada lying face down with his hands folded under him. He was unresponsive and had a faint pulse. The nurse assistant called security, who in turned contacted an Emergency Room nurse. A respiratory technician examined Mr. Mejia-Estrada and found two socks stuck in his mouth or throat. Efforts to revive Mr. Mejia-Estrada were unsuccessful and he was pronounced dead at or about 1:00 P.M. *Bronston Affidavit*, ¶¶ 27, 33-39. Plaintiffs allege that Defendants failed to properly monitor Mr. Mejia-Estrada or to timely initiate efforts to revive him.

Plaintiffs' counsel sent a letter to Sunrise's risk management department on September 11, 2008, notifying it that his law firm represented all of the heirs of Mr. Mejia-Estrada arising out of all claims for his death on July 27, 2008 and offering to settle the heirs' claims for Sunrise's liability insurance coverage limits. *Defendants' Opposition to Motion to Compel (#58), Exhibit B.* Plaintiffs' counsel also filed a complaint against Sunrise with the Nevada Department of Health and Human Services (NV-DHHS) based on Sunrise's alleged violation of its emergency care obligations under 42 CFR § 489.24.[2] The NV-DHHS conducted a survey of Sunrise on August 6, 2008 in regard to the allegation of noncompliance and thereafter reported its findings to the United States Department of Health and Human Services/Centers for Medicare and Medicaid Services ("HHS-CMS"). *See Motion to Compel (#50), Exhibit 3, HHS-CMS's October 19, 2008 letter to Plaintiffs' counsel and HHS-CMS's October 19, 2008 letter to Sunrise Hospital.*

In its October 19, 2008 letter to Sunrise, HHS-CMS stated that it had preliminarily determined that Sunrise had violated 42 CFR § 489.24 by failing to provided an appropriate medical screening examination and that its Medicare program provider agreement was therefore

---

[1] According to Defendant's Countermotion for Summary Judgment (##56, 57), page 3, Mr. Mejia-Estrada was placed in the "Discharge and Observation Unit" at 5:25 A.M. to wait an evaluation by the Southern Nevada Adult Mental Health agency.

[2] This regulation incorporates the requirements of 42 U.S.C. § 1395dd which, as discussed herein, requires hospital emergency departments to conduct a medical screening of all patients and, if it is determined that the patient has an emergency medical condition, to stabilize that condition before the patient is discharged or transferred to another facility.

subject to termination. HHS-CMS stated that Sunrise could avoid termination of its provider

agreement and public notice of the same by "providing credible allegation or credible evidence of

correction of the deficiencies or by successfully proving that the deficiencies did not exist."

*Plaintiffs' Exhibit 3.* Sunrise submitted a written response and plan of correction to HHS-CMS on

October 28, 2008. *Motion to Compel (#50), Exhibit 4.* In its response letter, Sunrise stated that

"[t]he actions taken to correct the deficiencies include review and revisions, when appropriate, to

the policies and procedures relating to EMTALA regulations, Medical Screening Examinations and

patient monitoring." *Id.* In its responses on the HHS-CMS Statement of Deficiencies form,

Sunrise further stated:

> The Hospital initiated an internal review and in depth root cause
> analysis of this case on July 27, 2008. Sunrise Hospital and Medical
> Center does not have licensed psychiatric beds. As the Hospital does
> not provide psychiatric services, the Hospital does not have a
> psychiatrist listed in the physician ED on call roster. All of the
> Sunrise ED physicians are qualified and competent to perform a
> Medical Screening Examination (MSE) to determine if an
> Emergency Medical Condition (EMC) related to a psychiatric
> condition is present.

Sunrise further stated:

> A Medical Screening Exam was performed on this patient, and was
> still in progress at the time of the patient's death. The ED Physician
> determined as required by NRS. 433A.170 (See Exhibit B1) and
> noted on the Nevada Legal 2000 (L2K) R form (See Exhibit B2), the
> patient had "no medical disorder or disease other than a psychiatric
> problem that required hospitalization." As part of the ongoing MSE,
> monitoring was required. The patient was placed in the Emergency
> Department Discharge Observation Unit (DOU) to await evaluation
> by the County Mobile Crisis providers. Staff assigned to this
> geographic location do not have responsibility for other patients.

*Plaintiffs' Exhibit 4*, *Sunrise's response to Statement of Deficiencies, pages 1, 3.*

Plaintiffs served Requests for Production of Documents on Defendant Sunrise which seek

practically every document in its possession, custody or control that contains information about Mr.

Mejia-Estrada's visits to Sunrise Hospital, including any and all witness statements and

investigation reports. *See Motion to Compel (#50), Exhibit 5, Defendant Sunrise Hospital's*

4

*Responses to Requests for Production Nos. 1, 2, 7, 15, 16, 21, 22, and 32.*[3]  Sunrise objected to these requests on the grounds that they seek "information protected by the Peer Review Patient Safety and Quality Assurance Committees Privilege pursuant to Nevada Revised Statute [NRS] 49.117, 49.119, 49.265, 439.860 and 439.875."  *Id.*  Sunrise also objected to Request Nos. 1, 2, 7 and 15 on the grounds that the requests seek information protected by the attorney-client privilege and attorney-work product doctrine.  In addition to objections based on privilege, Sunrise objected that the requests are over broad and ambiguous as to time and scope.

Plaintiffs argue that the Nevada statutory privileges do not apply in a federal action alleging claims arising under federal law and that there are no comparable medical peer review or self analytical privileges recognized under federal common law.  Plaintiffs also argue that Defendants have not provided a privilege log or other evidence to support their claims of attorney-client privilege or work-product immunity.

## DISCUSSION

### 1.    Scope of State Law privileges Asserted by Defendants

The Court first addresses the Nevada statutory privileges asserted by Defendants and the scope of those privileges under Nevada law.  In their objections to Plaintiffs' requests for production, the Defendants asserted the medical peer review privilege under NRS 49.117, NRS 49.119 and NRS 49.265.  NRS 49.117 and NRS 49.119 apply to the proceedings of a "review committee" which includes an organized committee of a hospital responsible for evaluating and improving the quality of care rendered by the parent organization or "a peer review committee of a medical . . . society."  *See* NRS 49.117.1 and 2.  Pursuant to NRS 49.119, a review committee has a privilege to refuse to disclose and to prevent any other person from disclosing its proceedings and records and testimony given before it.

NRS 49.265 more specifically grants a privilege in regard to the proceedings of organized committees of hospitals and other organizations that provide emergency medical care which have

---

[3] Request No. 32 seeks reports relating to any other medical malpractice and EMTALA cases which occurred during the five years preceding the incident involving Mr. Mejia-Estrada.

responsibility for evaluating and improving the quality of care.  The Nevada Supreme Court has stated that this statute should be narrowly construed and that it is "'extremely limited' in scope.'" *Columbia/HCA Health Care v. District Court*, 113 Nev. 521, 530, 936 P.2d 844, 848-849 (1997); *Ashokan v. State, Dep't. of Ins.*, 109 Nev. 662, 668, 856 P.2d 244, 247 (1993).  The purpose of the statute is to protect only the internal operations of peer review committees. *Columbia/HCA*, 113 Nev. at 530, 856 P.2d at 850.  The Court quoted with approval the decision by the North Dakota Supreme Court in *Trinity Medical Ctr. v. Holum*, 544 N.W.2d 148, 157 (N.D.1996) which stated that the privilege is limited to protecting only the formal proceedings before the committee and the internal records generated by the committee.  This would include testimony given to the committee at the hearing, the deliberations and discussions of the committee members, and the minutes of committee meetings.  The privilege does not include other information or data provided to the committee or collected for the committee's review by hospital departments and employees. *Columbia/HCA*, 113 Nev. at 529, 856 P.2d at 849.  Thus, "occurrence reports" prepared by the hospital are not protected by the statute.

Although Defendants asserted the foregoing statutory privileges in their objections to Plaintiffs' discovery requests, they state in their opposition to the motion to compel that no *peer review* investigation was actually conducted in regard to Mr. Mejia-Estrada's suicide.  They assert, instead, that an investigation, which they characterize as a "Root Cause Analysis" or "RCA," was conducted pursuant to Nevada Revised Statutes (NRS) 439.800-439.890 and that the reports and other documents and information compiled or disseminated as part of that investigation are privileged under NRS 439.860.[4] *See Opposition to Motion to Compel (#58)*, page 7.

NRS 439.800 et seq. imposes certain reporting and investigation duties on hospitals and other "medical facilities" concerning "sentinel events."  NRS 439.830 defines a sentinel event as

---

[4] NRS 439.860 provides that "any report, document and other information compiled or disseminated pursuant to the provisions of NRS 439.800 to 439.890, inclusive, is not admissible in evidence in any administrative or legal proceeding conducted in this State."  As discussed herein, the statutory privileges from disclosure during discovery or otherwise are actually set forth in NRS 439.840.2 and NRS 439.875.2.

"an unexpected occurrence involving facility acquired infection, death or serious physical or psychological injury or the risk thereof." NRS 439.837 requires the medical facility to conduct an investigation concerning the causes or contributing factors of a sentinel event and implement a plan to remedy them. NRS 439.870 requires a medical facility to designate an officer or employee to serve as patient safety officer, whose duties include taking such action as the officer determines necessary to ensure patient safety as the result of an investigation of a sentinel event.

Pursuant to NRS 439.835(1)(a), an employee of a medical facility is required to notify the patient safety officer of a "sentinel event" within 24 hours after becoming aware of it. The patient safety officer is required to report the date, the time, and a brief description of the sentinel event to the state Health Division within 13 days after the officer is notified of the event. NRS 439.835.1(b). The patient safety officer is also required to report sentinel events that he or she personally discovers. NRS 439.841.1 provides that upon receipt of a report pursuant to NRS 439.835, the Health Division may request additional information regarding the sentinel event or conduct an audit or investigation of the medical facility.

NRS 439.843.1 also requires medical facilities to provide the Health Division with an annual summary of the reports submitted by the medical facility to the Health Division during the immediately preceding calendar year. The summary must include the total number and types of sentinel events reported by the facility, a copy of the facility's patient safety plan, a summary of the membership and activities of the patient safety committee and "any other information required by the State Board of Health concerning the reports submitted pursuant to NRS 439.835."

NRS 439.840.2 states:

> Except as otherwise provided in this section and NRS 239.0115, reports received pursuant to NRS 439.835 and subsection 1 of NRS 439.843 and any additional information requested by the Health Division pursuant to NRS 439.841 are confidential, not subject to subpoena or discovery and not subject to inspection by the general public.

The Nevada Supreme Court has yet to construe NRS 439.840.2. The Court has generally stated that privileges should be narrowly construed because they are exceptions to the principle that courts are entitled to "every man's evidence" and are in derogation of the search for truth. *Ashokan*

*v. State, Dep't. of Ins.*, 109 Nev. at 668, 856 P.2d at 247, citing *United States v. Nixon*, 418 U.S. 683, 710 (1974). NRS 439.840.2 plainly provides that the reports received by the Health Division pursuant to NRS 439.835 and NRS 439.843.1 are confidential and the Health Division cannot be compelled to produce them by subpoena or other methods of discovery. The medical facility that prepares reports and sends them to the Health Division pursuant to NRS 439.835 and NRS 439.843.1 should also be protected from being required to produce these reports. Otherwise, the confidentiality accorded to such reports would be rendered meaningless.

NRS 439.840.2 also plainly provides that additional information requested by the Health Division cannot be obtained from the Health Division by subpoena or other methods of discovery. Consistent with *Columbia/HCA Health Care v. District Court*, however, this provision does not provide a cloak of confidentiality to otherwise non-privileged documents or information in the possession, custody or control of the medical facility. For example, a medical facility is not shielded from being required to produce relevant medical records merely because it provided the records to the state Health Division pursuant to a request under NRS 439.841.1.

NRS 439.875 also requires the medical facility to establish a patient safety committee whose members must include the patient safety officer. Pursuant to NRS 439.870, the patient safety officer is required to report to the patient safety committee any action he or she has taken to ensure patient safety as a result of an investigation of a sentinel evident. The patient safety committee is required to evaluate the actions of the patient safety officer in connection with all reports of sentinel events, review and evaluate the quality of measures taken by the medical facility to improve the safety of patients, make recommendations to the executive or governing board of the facility to reduce the number and severity of sentinel events and provide the executive or governing board with a quarterly report regarding the number of sentinel events that have occurred during the preceding quarter, and any recommendations to reduce the number and severity of sentinel events.

NRS 439.875.2 states as follows:

> The proceedings and records of a patient safety committee are subject to the same privilege and protection from discovery as the proceedings and records described in NRS 49.265.

. . .

8

Because this statute incorporates the privilege granted in NRS 49.265, it should be given the same narrow construction that the Nevada Supreme Court placed on NRS 49.265 in *Columbia/HCA Health Care v. District Court* and *Ashokan v. State, Dep't. of Ins.* In order for Sunrise to invoke the privilege under NRS 439.875.2, it must also show that it has appointed a patient safety officer and established a patient safety committee in compliance with NRS 439.875.1 and that the documents and information it seeks to protect from disclosure were generated for the proceedings of the patient safety committee. *See Zander v. Craig Hospital*, 743 F.Supp.2d 1225, 1232 (D.Colo. 2010) (in order to establish that information was privileged under the state's "quality management privilege," the hospital was required to show, at minimum, that (1) it has a quality management program which has been approved by the state agency and (2) the information claimed to be privileged was obtained and maintained in accordance with the approved program.).

Before determining whether the documents and information withheld by Defendants are within the scope of these privileges, the Court must first determine whether there is a comparable privilege under federal law or whether the foregoing state law privileges should be applied in this action.

**2. There is No Medical Peer Review or Self Critical Analysis Privilege Under Federal Common Law.**

Rule 501 of the Federal Rules of Evidence provides that the federal law of privilege applies unless state law supplies the rule of decision as to the claim or defense, in which case the state law of privilege applies. Where the complaint alleges both substantive federal and state law claims concerning the same alleged conduct, the federal law of privilege controls. *Agster v. Maricopa County*, 422 F.3d 836, 839-40 (9th Cir. 2005), citing *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 104 (3d Cir. 1982). *See also Williams v. University Medical Center*, — F.Supp.2d —, 2010 WL 5564639, *2, (D.Nev. 2010), citing *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992).

In *Agster v. Maricopa County*, 422 F.3d 836 (9th Cir. 2005), the plaintiffs' decedent died after being placed in a "restraint chair" while incarcerated in the county jail. The entity, whose employees had given medical care to the decedent, was obligated to undertake a mortality review

by its own policies and by the standards of "the National Commission on Correctional Health Care Standards for Health Services in Jails." The review was designated a "Critical Incident Report" and was intended to be and was kept confidential. The plaintiffs brought suit in state court against the county, the sheriff's office and certain individuals. Although the decision does not state what specific legal claims were alleged, the plaintiffs presumably alleged a federal civil rights claim. The county removed the action to federal court. During discovery, the district court overruled the defendants' objection to producing the "Critical Incident Report" based on Arizona's statutory peer review privilege.

In affirming the district court's order, *Agster* noted that no case in the Ninth Circuit had recognized a federal "peer review privilege." *Agster*, 422 F.3d at 839. The court acknowledged that it has the power to create a new privilege as a matter of federal common law where a public good transcending the normally predominate principle disfavoring testimonial privileges justifies recognizing a new privilege. *Id.* citing *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). The court, however, declined to recognize a federal peer review privilege based on two considerations. First, the court stated that it was reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns, but has not provided the privilege itself. *Id.* citing *Univ. of Pennsylvania v EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). The Court noted that the federal Health Care Quality Improvement Act, 42 U.S.C. § 11101, et seq., grants immunity to participants in medical peer reviews, but does not "privilege the report resulting from the process." Congress also did not grant a privilege when it later amended that Act to make clear that it does not preempt state peer review laws. The court concluded: "As Congress has twice had occasion and opportunity to consider the privilege and has not granted it either explicitly or by implication, there exists a general objection to our doing so." *Id.*

*Agster* also declined to recognize the privilege in the circumstances of that case which involved a report bearing on the death of a prisoner in state custody. The court stated that in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient. In the prison context, however, the safety and efficiency of the prison may operate as goals

10

1  that affect the care offered, and "it is peculiarly important that the public have access to the

2  assessments by peers of the care provided." *Id.*

3      In *Williams v. University Medical Center*, — F.Supp.2d —, 2010 WL 5564639 (D.Nev.

4  2010), the court also declined to recognize a federal medical peer review privilege. The plaintiff in

5  *Williams* alleged that the county hospital and other defendants wrongfully revoked his medical staff

6  privileges. His complaint alleged federal causes of action for violation of his Fourteenth

7  Amendment rights under 42 U.S.C. §1983 and for violation of the Sherman and the Clayton Acts.

8  The complaint also alleged pendent state law claims. In declining to recognize a federal peer

9  review privilege, the court cited *Agster*'s statement that no case in the Ninth Circuit has recognized

10  a federal medical peer review privilege and that Congress did not create such a privilege when

11  given the opportunity to do so. *Williams* also noted that although at least forty-six states have

12  enacted laws prohibiting the disclosure of peer review materials, the vast majority of federal courts

13  have rejected the creation of a federal common law medical peer review privilege. *Id.* at *4, citing

14  *Virmani v. Novant Health Inc.*, 259 F.3d 284 (4th Cir. 2001) and *Memorial Hospital for McHenry*

15  *County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981). *Williams* also cited numerous federal district

16  court decisions that have declined to recognize the privilege.

17      Defendants argue that the "root cause analysis" privilege they seek to assert in this case is

18  different from a "peer review" privilege relating to the granting or revoking of medical staff

19  privileges–which Congress did not grant when it enacted the Health Care Quality Improvement

20  Act. Accordingly, they argue that *Agster* does not preclude the recognition of a common law "root

21  cause analysis" or critical self analysis privilege. The investigation at issue in *Agster*, however,

22  was substantially similar to the type of investigation at issue in this case–i.e, an investigation

23  relating to the adequacy of the medical care provided to a particular patient. *Agster* is therefore not

24  distinguishable from this case based on the type of investigation or report involved. Secondly,

25  although the specific focus of medical peer review and "root cause" analysis investigations may be

26  different, their basic purpose is the same–patient safety and the quality of medical care.

27      This Court finds no reason to distinguish or depart from *Agster*, *Williams* and the majority

28  of federal court decisions that have refused to recognize federal common law privileges in this area.

The Court, therefore, declines to recognize a federal medical peer review privilege or a federal privilege relating to a hospital's investigation concerning the adequacy of medical care provided to a particular patient.  Accordingly, Sunrise's Root Cause Analysis (RCA) report is not privileged from discovery under federal common law.

### 3. Application of State Law Privileges in a Federal Civil Action.

Defendants assert that the sentinel event investigation or RCA "is clearly a state created issue that requires the application of state law." *Opposition (#58)*, page 9.  In support of this assertion, Defendants cite *Zander v. Craig Hospital*, 743 F.Supp.2d 1225 (D.Colo. 2010) and *William Beaumont Hospital v. Medtronic, Inc.*, 2010 WL 2011495, *4 (E.D.Mich. 2010).  *Zander v. Craig Hospital*, however, clearly involved the application of a state privilege to claims governed by state law.  In construing and applying Colorado's statutory "quality management privilege," the court explicitly stated that plaintiff's claim was "'based upon a state cause of action as to which state law controls the determination of privilege.'"  *Zander,* 743 F.Supp.2d. at 1230, citing *White v. American Airlines*, 915 F.2d 1414, 1424 (10th Cir. 1990).  In *William Beaumont Hospital v. Medtronic, Inc.*, the court construed and applied Michigan's statutory peer review privilege.  The case did not discuss Fed.R.Evid. 501 or even describe the specific legal claims in the action.  There is no reason to believe that the court applied the Michigan peer review privilege to claims arising under and governed by federal law.

A number of federal district court decisions have addressed the issue of whether state law peer review or similar privileges apply in an action alleging a claim under EMTALA and state claims for negligence or medical malpractice.  *Bennett v. Kent County Memorial Hospital*, 623 F.Supp.2d 246 (D.R.I. 2009); *Moses v. Providence Hospital and Medical Centers, Inc.*, 2007 WL 1806376 (E.D.Mich. 2007); *Guzman v. Memorial Hermann Hospital System*, 2009 WL 427268, *5 (S.D.Tex. 2009) and *Atterberry v. Longmont United Hospital*, 221 F.R.D. 644 (D.Colo 2004).  As these cases demonstrate, a cause of action under EMTALA is not equivalent to a common law claim for medical malpractice.  In deciding whether state law privileges applied, the courts in these cases considered whether the documents or information withheld by defendants on privilege grounds were relevant to the plaintiffs' EMTALA claims, or were instead only relevant to the

negligence or malpractice claims governed by state law.  This Court therefore begins with a discussion of the scope of a claim pursuant to EMTALA.

In *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993, (9th Cir. 2001), the Ninth Court stated that  "Congress enacted EMTALA to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment.  In such situations, emergency rooms would either decline to provide treatment or transfer patients in an unstable condition to other hospitals, thereby jeopardizing patients' health."  The EMTALA statute imposes two duties on hospital emergency rooms.  The first duty is to screen a patient for an emergency medical condition, and if an emergency condition is found, the hospital has a duty to stabilize the patient before transferring him to another medical facility or discharging him.  *Id.* at 992.

The statute defines an "emergency medical condition," in part, as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual in . . .  serious jeopardy."  Under applicable regulations, a psychiatric disturbance may constitute an emergency medical condition.  *Baker*, 260 F.3d at 992, n. 1, citing 42 U.S.C. §1395dd(e)(1)(A) and 42 CFR §489.24(b)(i).  The hospital's duty to stabilize arises only when it actually detects an emergency medical condition.  "Stabilize means . . . to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]"  42 U.S.C. §1395dd(e)(3).  If the patient's condition has not been stabilized, the hospital may not transfer the patient to another medical facility unless the patient or his proxy requests the transfer in writing or a physician or other medical professional certifies that the medical benefits available at the other facility outweigh the risks of transfer.  *Baker*, 260 F.3d at 993.

The statute specifically limits the screening examination that the hospital is required to provide to one that is "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department.  *Baker,* 260 F.3d at 993; 42

U.S.C. §1395dd(a).  *Baker* further states, that "[t]he statute is not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice."  *Id.* citing *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995).

In *Jackson v. East Bay Hospital*, 246 F.3d 1248, 1256-57 (9th Cir. 2001), the court held that a hospital did not violate EMTALA even though it misdiagnosed an emergency condition as a psychiatric rather than a medical condition.  The hospital diagnosed decedent as suffering from a psychiatric problem and arranged for him to be transferred to an in-patient mental health treatment facility.  The decedent, in fact, was suffering from drug toxicity which the hospital failed to diagnose prior to transfer.  Although such misdiagnosis potentially supported a state law medical malpractice claim, it did not constitute a violation of EMTALA.  *Jackson* cited decisions from other circuits in describing the distinction between a claim under EMTALA and a state law claim for medical malpractice:

> Seven of our sister circuits have held that to comply with this requirement, a hospital only must provide a screening examination that is comparable to that offered to other patients with similar symptoms.  *See Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1192-93 (1st Cir.1995) ("[F]aulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute."); *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 879 (4th Cir.1992) ( "[W]hile EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening."); *Marshall v. E. Carroll Parish Hosp. Serv.,* 134 F.3d 319, 323-24 (5th Cir.1998) ("[A] treating physician's failure to appreciate the extent of the patient's injury or illness ... may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening. . . . It is the plaintiff's burden to show that the Hospital treated her differently from other patients"); *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 272 (6th Cir.1990) ("If [the hospital] acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute."); *Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1139 (8th Cir.1996) (en banc) ("[W]e hold that instances of 'dumping' or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA.  But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not."); *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994) ("As long as a hospital

14

applies the same screening procedures to indigent patients which it applies to paying patients, the hospital does not violate this section of the Act."); *Gatewood v. Wash. Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991) ("[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures.").

The Ninth Circuit in *Jackson* adopted this comparative test as the standard for compliance with EMTALA. Although *Jackson* dealt with EMTALA's medical screening requirement, it is clear that the comparative test also applies to a hospital's duty to stabilize the patient's emergency medical condition before transferring him to another facility or discharging him. Thus, evidence that the hospital was negligent in failing to properly stabilize the patient's emergency medical condition before transfer or discharge does not establish a claim under EMTALA unless it is also shown that the failure to stabilize was the result of disparate treatment provided to patients who are unable or less able to pay for medical care.

The Court now analyzes the federal district court decisions which have addressed whether state peer review or similar privileges apply in actions which allege claims under EMTALA and also under state law for medical malpractice. In *Bennett v. Kent County Memorial Hospital*, 623 F.Supp.2d 246 (D.R.I. 2009), the hospital emergency department performed a medical screening examination, and diagnosed and treated the decedent patient's medical and psychological conditions before discharging her. The emergency room physician, however, did not order a CAT scan which would have arguably revealed that the patient had an acute subarachnoid hemorrhage from which she subsequently died. The hospital's emergency department review group reviewed the case and made certain findings regarding the standard of care the patient received. The plaintiff's attorney attempted to question the physician-chairman of the review group at deposition about the standard of care regarding the treatment provided to the patient. The physician-chairman had not participated in the patient's treatment and his knowledge was derived only from his participation on the review committee. In holding that the information was privileged under the Rhode Island peer review privilege, the court stated that it appeared from the pleadings that the essence of the case lay in medical malpractice–specifically the alleged failure of the attending physician to order a CAT scan during the decedent's initial visit. The court further stated:

15

Kent's liability under EMTALA attaches only if Hall was not afforded appropriate screening to detect an emergency condition and/or she was discharged while she was medically unstable. *Correa,* 69 F.3d at 1190.  To support her EMTALA claim, Bennett will have to show that Dr. Quas failed to administer medical tests to Hall or provide her with care that he deemed necessary for Hall's diagnosis or treatment and that he had, or would have, administered such tests to other patients exhibiting the same or similar symptoms as Hall. In other words, Bennett must demonstrate that Hall received disparate treatment when compared to treatment received by other, similarly situated patients.  Bennett now seeks to discover from the Director of the Kent E.D. whether treatment of Hall by Dr. Quas met Kent E.D. standards.  This Court concludes that the information Bennett seeks to elicit from Dr. Dinwoodie is irrelevant with respect to her EMTALA claim.

*Bennett*, 623 F.Supp.2d at 254-5.

In *Moses v. Providence Hospital and Medical Centers, Inc.*, 2007 WL 1706376 (E.D.Mich. 2007), the decedent took her husband to the hospital emergency room.  The husband had signs and symptoms of acute mental illness, including high blood pressure, disorientation, nausea, vomiting, and severe emotional and psychiatric changes.  The husband received treatment in the ER for his physical complaints and was then admitted to the hospital for treatment of his psychiatric problems where he remained for 6 days until discharge.  Ten days after his discharge, the husband murdered his wife.  The plaintiff alleged that the decedent's death was caused by the hospital's EMTALA violation and the negligence of the hospital and the physician.  The plaintiff sought production of materials related to the hospital's peer review investigation.  The plaintiff asserted that it was seeking the peer review documents only for purposes of the EMTALA claim to which the state peer review privilege was inapplicable.  The court, however, was not persuaded that the documents were relevant to the EMTALA claim.  The court stated that "[t]he sole issue in this EMTALA claim is whether Mr. Howard was diagnosed with an emergency condition, a fact which can be established from the medical records, and if so, whether the hospital transferred (i.e. discharged) him when he was not stable." *Id.* at *2.  The court held that the peer review materials, which may have included a post-mortem conference designed to address whether staff should have known of some underlying condition or should have diagnosed something different, may have been relevant to the malpractice claim, but were not relevant to the EMTALA claim.   The court therefore applied the state peer review privilege and upheld the defendant's objection to production of the peer review

16

materials.

In *Guzman v. Memorial Hermann Hospital System*, 2009 WL 427268, *5 (S.D.Tex. 2009), an emergency room physician examined an ill seven year old patient and ordered several laboratory tests, including a complete blood count (CBC), which included a white blood cell differential test. The physician diagnosed the patient with a viral syndrome and discharged him with instructions that his parents should bring him back within 24 hours if he did not improve.  The physician allegedly failed to review the results of the white blood cell differential test which would have revealed that the patient had pneumonia and sepsis.  The court cited several district court decisions which hold that if the evidence sought is relevant only to the state law claims, then the federal court will apply state law privilege.  *Guzman* at *5.  The court noted, however, that a few cases, including *Burrows v. Redbud Community Hospital District*, 187 F.R.D. 606 (N.D.Cal. 1998), have held that federal privilege law controls even if the evidence sought is relevant only to the pendent state law claim.[5]  The *Guzman* court agreed with those courts which hold that where the evidence sought is relevant only to the state law claims, the state law privilege should govern.   The court reviewed the hospital's "root cause analysis" report *in camera* and found no indication in the report that the patient's post-discharge medical problems were due to disparate medical care by provided by the hospital.  The court therefore held that the information was not relevant to the EMTALA claim and that the state law privilege applied.

In contrast to the foregoing cases, the court in *Atteberry v. Longmont United Hospital*, 221 F.R.D. 644 (D.Colo. 2004), found that the hospital's peer review or quality assurance reports were relevant to plaintiff's EMTALA claim and therefore discoverable under federal law.  The plaintiff's decedent was taken to the hospital emergency room following a motorcycle accident.  Upon arrival,

---

[5] The court in *Burrows v. Redbud Community Hospital District*, 187 F.R.D. 606, 610-11 (N.D.Cal. 1998), stated as a general rule that state law claims which are pendent to federal questions claims  are governed by federal privilege law.  The court also held, however, that the evidence sought in that case was relevant both to the plaintiffs' EMTALA claim and state law claim.  The decision did not elaborate on the underlying facts of the case, but indicated that plaintiff's infant child died after being transferred from defendant's hospital to another medical facility.

the decedent was in hypovolemic shock from internal hemorrhages, with no blood pressure on oxygen saturation readings that could be obtained.  The plaintiff alleged that the hospital trauma surgeon should have operated on plaintiff within one hour of his arrival in order to stop his bleeding and save his life.  Instead, the trauma surgeon allegedly allowed the decedent to continue to bleed, to remain unstable and to further deteriorate during the three hours he was in the emergency room.  He was then transferred to another hospital by flight for life helicopter, but died enroute.  Plaintiff requested production of quality assurance reports, peer review reports and morbitity/mortality reports relating to decedent's medical care.  The defendant objected to these requests based on the Colorado state peer review privilege and quality management privilege.  The court held that the information sought by plaintiff was relevant to the EMTALA claim.  It also stated that "the federal law of privilege governs even where the evidence sought also may be relevant to pendent state law claims."  *Atteberry*, 221 F.R.D. at 646-7 (citations omitted).

The approach taken by the courts in the foregoing cases is consistent with the Ninth Circuit's analysis of the legal distinction between a claim under EMTALA and a state law claim for medical malpractice.  This Court agrees with *Guzman* and the apparent majority of courts that a federal district court should not refuse to apply state law privileges where the information sought is relevant only to a claim or defense to which state law supplies the rule of decision.  It may also be appropriate in certain circumstances for the court to conduct an *in camera* review of the allegedly privileged materials to determine whether or not they are relevant to the plaintiff's EMTALA claim.

In this case, the Sunrise Emergency Room medical staff performed a medical screening examination on Mr. Mejia-Estrada when he returned to the hospital on July 27, 2008.  The hospital determined that Mr. Mejia-Estrada did not have a physical illness or injury, but that he was suffering from a psychiatric disturbance and was a risk of suicide.  There appears to be no dispute that Sunrise does not provide in-patient mental health treatment.  Pursuant to EMTALA, however, Sunrise was required to stabilize Mr. Mejia-Estrada's emergency medical condition, which in this case was a psychiatric disturbance, before it discharged him or transferred him to a mental health treatment facility.  In the context of Mr. Mejia-Estrada's condition, stabilization meant that the

1  hospital was required to either adequately treat or monitor Mr. Mejia-Estrada to prevent him from

2  harming or attempting to harm himself until he could be evaluated by the state mental health

3  agency and, if necessary, safely transferred to a mental health treatment facility.

4       Unlike *Atteberry*, the factual allegations in this case do not indicate, on their face, a

5  violation of EMTALA. The fact that Mr. Mejia-Estrada was able to commit suicide while under

6  Defendant's care, and while he was allegedly being monitored, raises an issue of medical

7  malpractice under state law. It does not indicate an EMTALA violation, however, unless Plaintiffs

8  also produce evidence that the medical care that Sunrise provided to Mr. Mejia-Estrada was

9  different from the type or level of care that Sunrise provides to other similarly situated patients.

10  While it is possible that discovery may lead to evidence supporting a claim under EMTALA, the

11  facts of this case, as they presently stand, do not necessarily support a finding that Sunrise's "root

12  cause analysis" report contains information relevant to Plaintiff's EMTALA clam.

13       There is, however, an additional factor that the Court must consider in deciding whether the

14  state law privileges should be applied in this case. On October 19, 2008 HHS-CMS notified

15  Sunrise of its preliminary finding that Sunrise had violated 42 CFR § 489.24 which incorporates

16  the requirements of EMTALA. In its October 28, 2008 response to HHS-CMS's preliminary

17  finding, Sunrise stated that it had "initiated an internal review and in depth root cause analysis of

18  this case on July 27, 2008." *Plaintiffs' Exhibit 4*, *Sunrise's response to Statement of Deficiencies,*

19  *page 1*. Sunrise went on to state that it had not violated the requirements of 42 CFR § 489.24 or

20  EMTALA and had taken necessary steps to correct deficiencies in its record keeping relating to the

21  monitoring of Mr. Mejia-Estrada. *Id., pages 1, 3*. While Sunrise's response also does not

22  necessarily indicate that its root cause analysis dealt with its compliance with EMTALA, if it did,

23  then information in the report relating to that issue is discoverable, notwithstanding the privilege

24  under NRS 439.875.2.

25       Although neither party has requested that the Court conduct an *in camera* review of the

26  Sunrise root cause analysis report(s), such review is appropriate in this case. A district court may

27  conduct an *in camera* review of allegedly privileged documents if the party seeking production

28  provides a factual basis adequate to support a good faith belief by a reasonable person that *in*

*camera* review may reveal that documents are not privileged or that an exception to the privilege applies. *See United States v. Zolin*, 491 U.S. 554, 571-72, 109 S.Ct. 261, 105 L.Ed.2d 469 (1989) and *In re Grand Jury Investigation*, 974 F.2d 1068, 1074-5 (9th Cir. 1992). Sunrise's reference to the report in response to the HHS-CMS's preliminary finding is sufficient to satisfy the threshold standard for *in camera* inspection. In addition, Sunrise has not expressly represented that the root cause analysis report does not discuss the hospital's compliance or non-compliance with EMTALA. Accordingly, the Court will order that Sunrise provide its internal review and root cause analysis report regarding Mr. Mejia-Estrada to the Court for *in camera* inspection to determine the applicability of the privilege under NRS 439.875.2. Sunrise is also required to show by affidavit or otherwise that its internal review and root cause analysis and the report(s) resulting therefrom, was conducted pursuant to an investigation for the hospital's patient safety committee.

It is unclear from Sunrise's's Opposition (#58) whether it submitted reports concerning Mr. Mejia-Estrada's suicide to the State of Nevada Health Division pursuant to NRS 439.835 and NRS 439.843.1. Because the state statutes specifically require that such reports be prepared and submitted to the Health Division, it is perhaps arguable that the privilege under NRS 439.840.2 should apply even if the reports contain information relevant to EMTALA. The Court need not decide this question, however, if the reports contain no information relevant to EMTALA. The Court therefore orders that these reports also be submitted for *in camera* review.[6]

. . .

. . .

---

[6] Plaintiff's Request for Production No. 32 requested any and all reports relating to any other medical malpractice and EMTALA cases which occurred during the five years preceding the incident involving Mr. Mejia-Estrada. Defendants objected to this request on the grounds that it is vague and ambiguous as to scope and also based on the state law privileges. Although Defendants failed to object to this request based on lack of relevance, the Court will not require Defendants to respond to this request. First, Plaintiff's motion to compel does not specifically move to compel a response to this request. Second, the request seeks medical information about non-parties who have legitimate privacy interests in their medical records and which are also protected from disclosure under HIPAA. Plaintiffs also made no attempt to limit the request to substantially similar incidents.

**4.      Defendants' Objections Based on the Attorney-Client Privilege and Work-Product Doctrine.**

Defendants also objected to Plaintiffs' Requests for Production Nos. 1, 2, 7 and 15 on the grounds that the requests seek documents protected from disclosure by the attorney-client privilege and attorney-work product doctrine.  The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures.  *Diamond State Ins. Co. v. Rebel Oil Company, Inc.*, 157 F.R.D. 691, 698 (D. Nev. 1994), citing *In re Grand Jury Investigation,* 974 F.2d at 1070.  The work-product doctrine protects from discovery documents and tangible things prepared by a party or its representative in anticipation of litigation.  *Id.* 157 F.R.D. at 698-9, citing *Admiral Insurance Company v. United States District Court, District of Arizona,* 881 F.2d 1486, 1494 (9th Cir.1989); *Schmidt v. California State Automobile Association,* 127 F.R.D. 182, 183 (D.Nev.1989).   The party asserting the attorney-client privilege or the work-product doctrine has the burden of proving that the privilege or doctrine applies for each document as to which it is asserted.

The Court construes Plaintiffs' Requests for Production as seeking documents relating to Mr. Mejia-Estrada's medical treatment that were generated prior to the commencement of this lawsuit.  Plaintiffs' counsel sent a letter to Defendant Sunrise's risk management department on September 11, 2008 in which he stated that he represented Mr. Mejia-Estrada's heirs in regard to all claims arising out of his death and offering or demanding settlement for the limits of Sunrise's liability insurance coverage.  It is reasonable to infer that Defendants were in anticipation of litigation once they received Plaintiffs' counsel's letter.  It is also possible that Defendants were in anticipation of litigation prior to that date, but it is Defendants' burden to demonstrate that they were.

Fed.R.Civ.Pro. 26(b)(5) states that when a party withholds relevant documents on the basis of privilege, the party must describe the nature of the documents, communications, or tangible things not produced or disclosed–and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.  This may be accomplished by providing a privilege log and affidavits or other documents that may be necessary to establish the

21

applicability of the privilege or doctrine. Affidavits or other evidence besides the privilege log may be particularly necessary to prove that the work-product doctrine applies. *See Diamond State Ins. Co. v. Rebel Oil Company, Inc.*, 157 F.R.D. 691, 698 (D. Nev. 1994). At the hearing of this matter, the Court ordered Defendants to provide appropriate privilege logs and/or affidavits as necessary to support their assertions of attorney-client privilege or the work-product doctrine. Once Defendants have provided their privilege logs and affidavits or other documents to support their assertions of the attorney-client privilege or the work-product doctrine, the parties' counsel should meet and confer to resolve any disputes regarding the assertion of privilege. If the parties are unable to resolve their differences, then Plaintiffs may again move to compel production of those documents that they believe are not privileged.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel Answers to Interrogatories and Requests for Production (#50) is **granted**, in part, as follows:

1.      Defendants shall, on or before **June 10, 2011**, serve and file an affidavit or documents which demonstrate that the internal review and "root cause analysis" investigation and the report(s) resulting therefrom, were conducted and prepared pursuant to the proceedings of the hospital's patient safety committee established in accordance with NRS NRS 439.875.

2.      Defendants shall, on or before **June 10, 2011**, deliver to the Court for *in camera* review their "root cause analysis" report(s) and reports provided to the Nevada Health Division pursuant to NRS 439.835 and NRS 439.843.1, relating to the decedent Oscar Mejia-Estrada. The Court will review these reports to determine whether they contain discoverable information relating to Plaintiffs' EMTALA claim and shall enter a further order as to whether the reports should be produced.

. . .

. . .

. . .

. . .

. . .

22

3.      Defendants shall, on or before **June 10, 2011**, provide Plaintiffs with privilege logs and any necessary affidavits or other documents to support their objections to the production of relevant documents based on the attorney-client privilege or the work-product doctrine.

DATED this 1st day of June, 2011.


GEORGE FOLEY, JR.
United States Magistrate Judge

23